UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ Selena Staley, Vivian Holmes,   │
│ and Olive Ivey,                 │
│                                 │
│         Plaintiffs,             │
│                                 │
│    -v-                          │
│                                 │
│ Hotel 57 Services, LLC, et      │
│ al.,                            │
│                                 │
│         Defendants.             │
└─────────────────────────────────┘
```

22-cv-6781 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

By Order dated May 5, 2023, the Court denied the defendants'
motion to compel arbitration of plaintiffs' claims and to strike the
class allegations in the plaintiffs' Amended Complaint. *See* Dkt. No.
70. The Court stayed all proceedings in this case until it rendered
an opinion explaining the reasons for its decision. *See* Minute Entry
Dated May 5, 2023. This Opinion sets forth the Court's reasons and
releases the stay.

## I.   **Factual Background**[1]

Plaintiffs Vivian Holmes, Olive Ivey, and Selena Staley worked
for over a decade at the Four Seasons Hotel, which is owned by defendant
Hotel 57 Services, LLC, and, as alleged by the plaintiffs, also owned
or operated by Ty Warner Hotels and Resorts, LLC and its Chief
Executive, Mr. Ty Warner. Dkt. No. 48, Amended Complaint at §§ 69-70,

---

[1] Unless otherwise noted, the following factual allegations are taken
from the plaintiffs' Amended Complaint, Dkt. No. 48. All inferences
are drawn in the plaintiffs' favor for the purposes of these motions.

111-12, 137-138. In 2020, coinciding with the COVID-19 pandemic, the defendants placed the plaintiffs and other employees on an indefinite furlough and closed the Four Seasons Hotel until further notice. *Id.* at § 3. As of the time of this writing, the hotel has not reopened nor have the plaintiffs returned to work. *Id.* at § 17.

On August 9, 2022, the plaintiffs brought this action on behalf of themselves, and others similarly situated, to challenge the hotel's decision to furlough them and to close the hotel for an indefinite period. *See generally* Dkt. No. 48, Amended Complaint. As relevant here, plaintiffs allege that their furlough -- because it has lasted longer than six months -- amounts to a "permanent layoff" and that being subject to such a layoff entitles them to no-fault separation pay and notice of termination. *Id.* at §§ 4-5, 7. They further allege that the hotel declined to make these payments and failed to provide the requisite notice. *Id.* at §§ 15-16, 22-24. In response, the defendants say that, because the furlough is temporary, they owe no legal obligations to the plaintiffs. Indeed, even if the plaintiffs are subject to a permanent layoff, defendants contend that they fulfilled all their legal obligations to the plaintiffs by providing notice of the furlough.

## II. **Discussion**

This Opinion deals with two motions brought by the defendants within the broader litigation. *First*, in their motion to compel arbitration, defendants claim that the plaintiffs must arbitrate their claims because, when they began working for the hotel, they signed an

employment contract that mandates arbitration of all employment claims that are not related to a "permanent layoff." Because the plaintiffs are, in defendants' view, subject to a *temporary* furlough -- not a permanent layoff -- they must arbitrate all claims related to their furlough. *Second*, the defendants seek to strike from the Amended Complaint all claims brought on behalf of the putative class, asserting that the employment agreement also prohibits plaintiffs from pursuing class claims in federal court. For the reasons stated below, the Court denies both motions.

A.    Motion to Compel Arbitration

In their first motion, the defendants assert that this case belongs in arbitration, not in this Court. This claim rests in large part on the defendants' interpretation of the arbitration provisions of the employment agreement between the parties, otherwise known as the "EmPact Agreement." *Id.* at § 163. More specifically, the agreement designates the "Complaint, Arbitration & Review for Employees" ("CARE") procedure as -- in all but a few cases -- the exclusive mechanism for resolving disputes between the hotel and its employees. And this process, in turn, requires that the parties submit all disputes related to an employee's termination to arbitration, except, as relevant here, for those that arise out of a permanent layoff.[2]

---

[2] To wit, all employees bringing claims "based on . . . termination of [their] employment from the Hotel (including constructive discharge, but not a permanent layoff)" must submit such complaint to arbitration, except where they "chose[] to opt out of the [contract's] mediation/arbitration provisions." *See* Dkt. No. 30, Exh. A ("Empact Agreement") at 54.

Here, the parties disagree over whether the plaintiffs' claims qualify as ones related to a "permanent layoff," and therefore, whether these claims fall within the ambit of the EmPact Agreement's arbitration provisions. As the plaintiffs see it, they *are* subject to a permanent layoff because their furlough has lasted longer than six months and has no definite end. By contrast, the defendants assert that no permanent layoff has occurred. In their view, a permanent layoff or no-fault termination occurs "only when the Hotel designates that action and offers (and an employee accepts) no-fault separation pay." Def. Br. at 4. According to the defendants, then, the hotel possesses the unilateral power to designate what counts as a "permanent layoff" or "no-fault separation." Id. If it were any other way, the defendants claim, plaintiffs could avoid arbitration in all cases "simply by [asserting] that they experienced a permanent layoff or no-fault termination." *Id.* at 6.

"An order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995). Moreover, the party resisting arbitration that shoulders the burden of proving that the arbitration contract does not encompass the claims at issue. *See Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342-43 (S.D.N.Y. 2014).

With this high standard in mind, the Court nevertheless finds that the arbitration provision of the EmPact Agreement is not "susceptible of an interpretation that covers" the claims brought by the plaintiffs. *See AT&T Techs., Inc.*, 475 U.S. 643, 650 (1986). This is because, under almost any definition, the employment action of the hotel -- if the Complaint's factual allegations are taken as true -- would qualify as a "permanent layoff."

For starters, the EmPact Agreement itself dictates that the phrase "permanent layoff," as it is used throughout the contract, should be "defined by law." *See* EmPact Agreement at 55. And the relevant statutes -- namely, the New York State and federal Worker Adjustment and Retraining Notice Acts ("WARN") that are at issue in this litigation -- define "permanent layoff" in a way that clearly encompasses plaintiffs' claims. Thus, the New York State WARN Act defines furloughs extending more than six months as a "permanent layoff" that triggers certain employer obligations. *See* N.Y Lab. Code § 921-1.1(f)(1)(iii)(D). The federal WARN counterpart, similarly, defines "a layoff exceeding [six] months" as a permanent "employment loss." *See* 29 U.S.C. § 2101(a)(6)(B).

These statutory definitions, furthermore, dovetail with the plain meaning of "permanent layoff." *See Painwebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) ("In interpreting a contract, words and phrases are given their plain meaning."). A permanent layoff most often refers to "the permanent termination of an employee for reasons unrelated to the employee's performance." *See, e.g., Webster's Dictionary, Furlough*

*v. Layoff: Explaining the Difference* (2023). Thus, seeing as the furlough has extended for over three years *and* defendants have not offered a performance-related reason for this furlough, it is fair to say that that the plaintiffs have, at least as a threshold matter, shown that their claims are related to a "permanent layoff."[3]

Defendants' contrary reading -- that the contract vests the hotel with the exclusive authority to deem what layoffs count as "permanent" -- is illogical, both from a practical perspective and as a matter of contractual interpretation. The relevant clause provides that, "in the event of a permanent layoff or 'no fault' termination," an employee "is eligible for separation pay" and, upon acceptance of that pay, cannot "challenge [their] termination through" the contract's "mediation/arbitration provisions." *See* EmPact Agreement at 57. According to the defendants, it follows that, under the contract, a "permanent layoff" occurs if and only if the defendants offer the employee a separation payment and the employee accepts the offer. This, however, gets it exactly backwards. The structure of the clause makes clear it is not the separation pay that triggers a "permanent layoff," it is the existence of a "permanent layoff" that entitles a terminated employee to "no-fault separation pay." Put another way, the cited provision of the contract says nothing about what actually counts

---

[3] This should not be taken, however, as a determination that the plaintiffs have *wholly* met their burden -- additional evidence adduced by discovery may reveal, for instance, that some exception applies to excuse whatever legal obligations would have otherwise run from the hotel to the employees.

as a "permanent layoff." What is more, "permanently layoff," as
previously noted, is defined by the WARN statutes. If an employer were
permitted to unilaterally determine which discharges count as
temporary or permanent simply by withholding or offering separation
pay -- no matter how inaccurate the designation would be -- they could
thereby shirk whatever legitimate statutory and contractual
responsibilities they owed to their employees.[4] That the defendants'
reading would result in a fundamentally unfair arrangement between the
hotel and its employees provides yet another reason to reject it.

In sum, the relevant statutes and the contract itself make clear
that the parties intended the term "permanent layoff" to refer to any
discharge of employment that lasts longer than six months and has no
definite end. As such, the factual allegations in the Amended Complaint
suggest that the defendants were subject to such a layoff and, thus,
that their claims are exempt from mandatory arbitration. The
defendants' motion to compel this case to arbitration is therefore
denied.

B. <u>Motion to Dismiss Class Claims</u>

Separately, the defendants argue that the EmPact Agreement
contains a class-action waiver that bars the plaintiffs from bringing
claims on behalf of a putative class of similarly situated employees.

---

[4] According to the defendants, the plaintiffs conceded that they were
not subject to a permanent layoff because they stated in their Amended
Complaint that they were "terminated," not laid off. This argument is
without merit. In the context of the Amended Complaint's factual
allegations, the words "terminated" and "permanent layoff" are
virtually synonymous.

Under the EmPact Agreement, an employee that does not "opt out of the mediation/arbitration provisions of CARE, . . . waive[s their] right to have [their] claims submitted as part of a class or collective action in court . . . [or] class arbitration." EmPact Agreement 56-57. Because the plaintiffs indisputably did not opt out of the CARE procedure, the defendants insist that their class claims be stricken from the Amended Complaint based on waiver. *See* Fed. R. Civ P. 12(f) ("[A district court] "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). The defendants' reading of the class-action waiver, however, is just as tortured as their interpretation of the contract's arbitration clause.

Before proceeding to the merits, the Court must decide what standard to apply to the defendants' motion. Despite the frequency with which conflicts over the scope of "class-action waivers" arise, our sister courts have said surprisingly little about the standard by which these disputes should be evaluated before the class certification stage. In the little they have said, however, courts have made clear that they view such motions with deep disfavor, primarily because the briefing and discovery accompanying a certification motion often makes the resolution of these legal questions more efficient and accurate. *See Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (submitting that a motion to strike class claims "is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation . . .

before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification").

Here, however, there are good reasons to not dismiss the defendants' motion out of hand. First, because the Court initially declined to stay discovery pending the resolution of this motion, the parties have already produced most if not all the discovery that may shed light on the scope of the class-action waiver. Second, the defendants here ask the Court to resolve a dispute with respect to the legal interpretation of a contract, an issue on which discovery may be less illuminating. *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 2022 WL 6994507 (S.D.N.Y. 2022) ("One circumstance where striking the class allegations may be appropriate is where a contractual waiver clearly precludes the possibility that a plaintiff's claim may be brought on a class-wide basis.").

Thus, though our sister courts are correct to regard most motions to strike class allegations with heightened skepticism, the Court applies a somewhat relaxed standard to the defendants' motion given the particulars of this case. Still, to show that the efficiency to be gained by striking the class claims at this stage outweighs the substantial interest plaintiffs possess in having this issue decided during class certification -- where their interpretation can be supported by additional briefing and class discovery -- the defendants must do more than demonstrate that their reading of the class-action waiver is the one the parties *probably* intended. Rather, where there

is a legal dispute over the scope of the waiver, they must demonstrate that the waiver -- read against the other provisions of the contract -- reveals, in a clear and convincing manner, an intent to preclude these claims from class-action litigation.

Defendants cannot satisfy this burden. At first blush, the plainly broad language of the waiver appears to supply strong support for the defendants' view. Indeed, when read in isolation, the clause seems to bar all those who did not opt out of the CARE arbitration procedure -- a category into which, the parties agree, the plaintiffs fall -- from bringing all claims as part of a class action or class arbitration, regardless of the substantive nature of these claims. However, when placed in the context of the broader employment agreement, the clause is most logically read as preventing employees only from bringing claims that they must otherwise arbitrate under the CARE procedure as part of a class. In other words, the clause does not bar the plaintiffs from bringing claims that are *exempted* from arbitration altogether, such as those based on a "permanent layoff" or "no fault separation," as part of a class action in federal court.

To see this, it is necessary to place the clause in conversation with the other parts of the agreement. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[W]hen interpreting [a] contract [the court] must consider the entire contract and choose the interpretation [of the clause,] 'which best accords with the sense of the remainder of the contract.'"). To begin with, it would be strange to require employees like the plaintiffs, whose claims are excepted from mandatory

10

arbitration under Step 6 of the CARE procedure, to expressly opt out of the procedure from which they are already exempt if they wish to preserve their class-action rights. Moreover, the class-action waiver should be considered in conjunction with the general-litigation waiver that appears right before it and that stipulates -- in language identical to the class-action agreement -- that employees who do not "opt out of the mediation/arbitration provisions of CARE . . . waive [their] right to have [their] case submitted to a court of law and decided by a judge and jury." *See* ECF No. 40-4 at 56-57.

The nearly identical structure and language in the two clauses "is strong indication that [they] should be interpreted *in pari passu*, i.e., in the same manner." *See United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008). But if we were to give the general-litigation waiver the same breadth that defendants ask us to apply to our reading of the class-action waiver, as this principle demands, the waiver would swallow up the other provisions relating to the rights of terminated employees. In other words, the general-litigation waiver -- as construed by the defendants -- would bar anyone who did not opt out of the CARE procedure from bringing their claims in court, regardless of the substantive nature of their claims. This plainly contradicts the "mediation arbitration" provision of the employment agreement, which *allows* individuals who did not opt of the CARE procedure to bring *in court* any termination claims related to a "permanent layoff." *See* ECF No. 40-4 at 56-57 (noting that individuals subject to a "permanent layoff" are not required to "submit [their]

complaint[s] to be heard by an independent mediator/arbitrator," thereby allowing them to bring these claims in court). Indeed, another provision of that same section explicitly *bars* employees terminated according to a "permanent layoff" from arbitrating their claims, the necessary implication being that they must bring their legal challenge in court if they choose to pursue them. *See* ECF No. 40-4 at 58 ("If I receive a permanent layoff with no right of recall . . . I understand that I may not seek mediation or arbitration of [my permanent layoff].").

In sum, construing the nearly identical class-action waiver in the same way as the general-litigation waiver would render other important contractual provisions -- each of which reflect careful tradeoffs made during negotiations between employees and employers -- null and void. *See Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (1996) (directing Courts to reject interpretations of a contract that would render any of its provisions "'meaningless or without force and effect"). And even if, contrary to the foregoing, we were to interpret the provisions apart from one another -- such that what it means to "opt out of the mediation/arbitration" procedure means something different in each of the provisions -- this would do violence to another axiom of contractual interpretation, the one requiring that the "same words found in different sections" be given "the same meaning." *See White v. Knickerbocker Ice Co.*, 254 N.Y. 3d 152, 159 (1930). Because the Court sees no reason to depart from either

of these well-founded principles of contractual interpretation, it rejects the defendants' view of the class-action waiver.

Of course, none of this resolves what the proper interpretation of the class-action waiver is. In the Court's view, the class-action waiver is best read as preventing employees who decline to opt out of the CARE procedure *and* whose claims are not premised on an exempted category from bringing class claims, either in arbitration or in court. The structure of the "mediation/arbitration" clause reveals this point. Under the contract, "if" the claims of a given terminated employee "[are] based" on "a permanent layoff," these claims are taken outside the purview of the "mediation/arbitration" process entirely and instead must be brought, according to the contract's other provisions, in court. *See* EmPact Agreement at 57 (barring those employees who were terminated as part of a permanent layoff from "seek[ing] mediation or arbitration of [their] permanent layoff"). If they are not so based, "then" any claims *must* be "submit[ted] . . . to be heard by an independent mediator/arbitrator . . . unless [the employee chose] to opt out of the mediation/arbitration provisions" altogether. EmPact Agreement at 55. For this latter group of non-exempted claims, the class-action waiver kicks in and bars the claimants from pursuing class claims in any forum whatsoever.

Indeed, the fact that the class-action waiver appears in the section detailing the CARE arbitration procedures -- rather than in a stand-alone section -- provides additional support for the view that the waiver was meant to apply only to this delimited group of former

employees. *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002) (holding that, under New York law, "[c]aptions are relevant to contract interpretation"); *see also Coley v. Cohen*, 289 N.Y. 365, 45 N.E.2d 913, 917 (1942) (construing contractual language in light of the heading of the section in which it is contained).

The defendants contest this interpretation because, they say, it would render superfluous part of the class-action waiver. In their view, the general-litigation waiver and the CARE procedure already bar employees from bringing claims that are not exempt from the CARE procedure as a class—action *lawsuit* (as opposed to arbitration). Interpreting the class-action waiver to do the same would make the waiver, as applied to claims brought in state or federal court, redundant. This argument, however, is self-refuting. If we were to adopt the defendants' view and construe the class-action waiver as applying to *all* claims brought by employees who did not expressly opt out of the CARE procedure, the class-action waiver would be duplicative of the general-litigation waiver.

More fundamentally, the defendants misunderstand this Court's task. When presented with a less-than-artfully drafted contract, the Court must choose between several interpretations of an ambiguous provision, adopting the one that best reflects the meaning of the contract and the intent of the parties to it. Much as it is the duty and province of the Court to say what the law is, it is also its responsibility to determine what a contract means. While the Court's

interpretation may render one-half of the class-action waiver superfluous, that is preferable to any of the alternatives, including those offered by the defendants, which would not only render whole swaths of the contract inoperative, but, as detailed above, would also lead to irreconcilable conflicts between the contract's various provisions. *See Ms. Liberty Inc. v. Eyelematic Mfg. Corp. Inc.*, 913 F. Supp. 264, 268 (S.D.N.Y. 1996) ("Where two interpretations of a contractual provision are possible, the preferable interpretation is the more equitable and rational of the two.").

The choice between interpretations is made easier by two other factors. First, ambiguities in a contract must be construed against the drafter. *See, e.g., Kerin v. U.S. Postal Serv.*, 116 F.3d 988, 992 (2d Cir. 2017). Second, and as noted above, the defendants bear a heavier burden than usual to prove that their view of the contract is the correct one. At bottom, construing the class-action waiver (and, by implication, the general-litigation waiver) as applying only to former employees who did not opt of the CARE procedure and whose claims are not premised on one of the exempted categories enumerated in Step 6 of CARE stands the best chance of giving full effect to the original intent of the parties. It is thus the reading the Court adopts at this stage. The Court therefore denies the defendants' motion without prejudice to its being re-raised at the class certification stage, where the Court may benefit from additional discovery on this issue.

In conclusion, the Court denies the defendants' motions to compel arbitration and to strike the class allegations. The stay previously

granted is now lifted and the parties should jointly call chambers by no later than July 10, 2023 to work out new case-management dates. The Clerk is respectfully directed to close the entries at docket numbers 35 and 59.

    SO ORDERED.

New York, NY
July 5, 2023

JED S. RAKOFF, U.S.D.J.